The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
February 27, 2025

## 2025COA23

**No. 23CA0085, *People v. Gray* — Constitutional Law — Sixth
Amendment — Confrontation Clause; Evidence — Witnesses —
Cross-Examination — Probationary Status**

This is the first published opinion to consider whether the

holding of *Margerum v. People*, 2019 CO 100, 454 P.3d 236 — that

criminal defense counsel can always cross-examine a witness

regarding the witness's probationary status — extends to situations

where the witness was on probation when the witness provided law

enforcement officers with a statement regarding the underlying

incident but is no longer on probation at the time of trial. The

division concludes that, under the facts of this case, the *Margerum*

rule does not apply to a witness who satisfied the terms of his

probation before trial.

COLORADO COURT OF APPEALS **2025COA23**

Court of Appeals No. 23CA0085
Weld County District Court No. 21CR1485
Honorable Julie C. Hoskins, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Mardi Jean Gray,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE LIPINSKY
Johnson and Moultrie, JJ., concur

Announced February 27, 2025

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kevin M. Whitfield, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendants in Colorado have the unconditional right to cross-examine a prosecution witness about the witness's probationary status when the witness is on probation in the "same sovereign" at the time of trial. *Margerum v. People*, 2019 CO 100, ¶ 12, 454 P.3d 236, 240. The supreme court noted in *Margerum* that, "when a prosecution witness is on probation, the key question is whether there exists a 'might have been influenced nexus' between the witness's probationary status and her potentially biased motive for testifying." *Id.* at ¶ 11, 454 P.3d at 239 (quoting *Kinney v. People*, 187 P.3d 548, 560 (Colo. 2008)). For this reason, the jury must be permitted to consider whether the witness's trial testimony "could be prompted by fear or concern for possible jeopardy to his probationary status," *id.* (quoting *People v. Bowman*, 669 P.2d 1369, 1375 (Colo. 1983)), and whether the witness "might be influenced by a promise of, or hope or expectation of, immunity or leniency," *id.* (quoting *People v. King*, 498 P.2d 1142, 1144-45 (Colo. 1972)). "Therefore, the defense must be permitted to question a prosecution's witness about her probationary status when the witness is on probation in the same sovereign as the prosecution." *Id.* at ¶ 12, 454 P.3d at 240.

¶ 2    A division of this court extended the reasoning of *Margerum* to situations where the witness faces criminal charges in the same judicial district in which the prosecution seeks the witness's testimony. *See People v. Reynolds-Wynn,* 2024 COA 33, ¶ 36, 551 P.3d 1211, 1218. As the *Reynolds-Wynn* division explained, "the defense must be permitted to question a prosecution witness about his pending criminal charge in the same judicial district in which the witness is testifying against the defendant" because, consistent with the reasoning of *Margerum,* "[t]he pendency of such a charge against the witness is always relevant to show that the witness's testimony '*might be influenced* by a promise for, or hope or expectation of, immunity or leniency.'" *Id.* (quoting *Kinney,* 187 P.3d at 560).

¶ 3    In this appeal, Mardi Jean Gray seeks reversal of her judgment of conviction for second degree assault and third degree assault. She contends that the trial court violated her constitutional right to confront her accusers by not permitting her to cross-examine Timothy Canciamilla, the alleged victim, about his probationary status at the time he spoke with police officers regarding an incident in which Gray struck and choked him (the

2

incident), even though Canciamilla was no longer on probation at the time of trial. We decline to extend the unconditional right of cross-examination articulated in *Margerum* to cases where the witness is no longer on probation at the time of trial.

¶ 4    Gray also raises a sufficiency of the evidence challenge, contending that the prosecution failed to disprove her affirmative defense of self-defense beyond a reasonable doubt.

¶ 5    Because we disagree with both contentions, we affirm.

## I.    Background

¶ 6    Gray and Canciamilla were dating at the time of the incident. There was no dispute that Gray repeatedly struck Canciamilla and choked him. Gray's theory of defense at trial was that she had acted in self-defense after Canciamilla shoved her down stairs by the throat. In Part II.A.1 below, we summarize the evidence introduced at trial regarding the incident.

¶ 7    We address Gray's sufficiency of the evidence argument first because, if we were to reverse on that issue, we would not need to address her argument that the court abused its discretion and violated her rights under the Confrontation Clauses of the United States and Colorado Constitutions.

## II.    Analysis

### A.    Sufficiency of the Evidence Regarding Gray's Affirmative Defense of Self-Defense

#### 1.    Additional Facts

¶ 8    The jury could reasonably have found the following facts from the evidence introduced at trial.

¶ 9    Gray and Canciamilla began arguing in Gray's home one evening after they had been drinking together.  Edward Epperson; his wife, Desiree Jones; and their children, who also lived in the house, were present during the incident.

¶ 10    Epperson told Gray and Canciamilla to stop arguing and to "keep it down."  Gray asked Canciamilla to leave the house.  He walked to his car, realized he was too intoxicated to drive, and returned to the house.

¶ 11    One of Epperson and Jones's children ran out of the house and told Canciamilla that Gray had "scratched her or something."  Canciamilla confronted Gray in the basement.

¶ 12    Canciamilla "screamed and yelled" at Gray, saying, "[I]f you're going to hit a child, hit me."  Canciamilla told the responding officers that Gray then paused and started hitting him on the side

of the head. After Canciamilla said, "[I]s that all you have?" Gray put her hands around his throat and squeezed his neck. Canciamilla struggled to breathe, gasped for air, and gagged. Epperson testified that Canciamilla was "pretty purple" and that "his eyes rolled in the back of his head like he was gasping for air."

¶ 13    Gray struck Canciamilla five or six times. Canciamilla told the officers that he did not defend himself and did not put his hands on Gray.

¶ 14    Epperson grabbed Gray, pulled her off Canciamilla, and told her to go upstairs. Jones called a friend, Chelsea Kretzmeier, and asked her to "come get the kids and . . . get them out of the house until [Jones] could get the situation resolved."

¶ 15    When Kretzmeier arrived at the house, Gray "was yelling and screaming" at Epperson and Jones. Kretzmeier testified that Gray "went after [Canciamilla] as he went outside," and she was "still screaming and yelling." Canciamilla was crying by his car. Kretzmeier said she had to use physical force to keep Gray away from Canciamilla. Kretzmeier testified, "When it was clear to me that [Gray] was not going to de-escalate, I told [Jones] it was time to call the cops, that this was getting out of control."

¶ 16    Jones called 911.  The responding officers spoke with Gray, Canciamilla, Epperson, Jones, and Kretzmeier.

¶ 17    Gray told Officer Janet Steingart that, before she struck Canciamilla, "[h]e shoved me down the stairs by my throat."  Officer Steingart said that Gray gave her a tour of the house and showed her the stairs down which Canciamilla allegedly shoved her.  According to Officer Steingart, the landing at the bottom of the stairs was made of concrete.

¶ 18    Officer Steingart reported seeing dried blood on Gray's lips, although she did not observe any physical evidence that Gray had been thrown down the stairs to the basement, as she claimed.  According to Officer Steingart, Gray did not have any injuries "consistent with being shoved down" stairs or hitting concrete, and there was no "hole in the wall" or other indicia of a fight at the stairs.  Kretzmeier testified that Gray said the incident was not her fault and that Kretzmeier did not observe any injuries on Gray "that [she] could tell."

¶ 19    Epperson told Officer Doryian Barboza that the dried blood around Gray's mouth may have resulted from her biting her lips or

from her "bad gums." Gray told Officer Steingart that she had "probably" bit her lip or tongue.

¶ 20     None of the witnesses, including the four witnesses the defense called, said they saw or heard Canciamilla shove Gray down the basement stairs. Gray exercised her Fifth Amendment right not to testify. *See People v. Roberson*, 2016 CO 36, ¶ 21, 377 P.3d 1039, 1042-43 ("The Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, . . . guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.'") (quoting U.S. Const. amend. V); *see also* Colo. Const. art. II, § 18. Therefore, Officer Steingart's testimony regarding Gray's statements to her was the only evidence introduced at trial supporting the defense's argument that, before Gray struck and choked Canciamilla, he had shoved Gray down stairs by the throat.

## 2.     Standard of Review

¶ 21     "[W]e review the record de novo to determine whether the evidence before the jury was sufficient both in quantity and quality to sustain the convictions." *People v. Harrison*, 2020 CO 57, ¶ 31, 465 P.3d 16, 23 (quoting *Dempsey v. People*, 117 P.3d 800, 807

(Colo. 2005)); *see People v. Tomaske*, 2022 COA 52, ¶¶ 31-32, 516 P.3d 534, 539-40 (explaining that the court reviews de novo whether the prosecution presented sufficient evidence to disprove an affirmative defense).

### 3. The Law Governing Sufficiency of the Evidence Challenges When a Defendant Argues Self-Defense

¶ 22    "The Due Process Clauses of the United States and Colorado Constitutions require proof of guilt beyond a reasonable doubt on each of the essential elements of a crime." *People v. Duncan*, 109 P.3d 1044, 1045 (Colo. App. 2004).  To determine whether the prosecution presented sufficient evidence to support a defendant's conviction, we ask "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *People v. Donald*, 2020 CO 24, ¶ 18, 461 P.3d 4, 7 (quoting *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010)).  In conducting this analysis, we "give the prosecution the benefit of every reasonable inference which might

be fairly drawn from the evidence." *Harrison*, ¶ 32, 465 P.3d at 23 (quoting *People v. Perez*, 2016 CO 12, ¶ 25, 367 P.3d 695, 701).

¶ 23   A defendant may raise a sufficiency of evidence argument for the first time on appeal, as Gray did here. *See McCoy v. People*, 2019 CO 44, ¶ 2, 442 P.3d 379, 382.

¶ 24   "'Affirmative defense' means that unless the state's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, shall present some credible evidence on that issue." § 18-1-407(1), C.R.S. 2024.  When a defendant asserts an affirmative defense, it "effectively becomes an additional element of the charged offense." *Roberts v. People*, 2017 CO 76, ¶ 22, 399 P.3d 702, 705.

¶ 25   "If the issue involved in an affirmative defense is raised, then the guilt of the defendant must be established beyond a reasonable doubt as to that issue as well as all other elements of the offense." § 18-1-407(2).  "[T]he prosecution bears the burden of proving beyond a reasonable doubt that the affirmative defense is inapplicable." *Roberts*, ¶ 22, 399 P.3d at 705.  Thus, "[w]hile the defendant bears the burden of going forward, Colorado law dictates that once that burden has been met, the prosecution has the

9

burden of disproving the claimed affirmative defense beyond a reasonable doubt." *People v. Garcia*, 113 P.3d 775, 784 (Colo. 2005).

¶ 26    Self-defense is an affirmative defense created by statute. Section 18-1-704(1), C.R.S. 2024, says, in relevant part, that

> a person is justified in using physical force upon another person in order to defend [herself] . . . from what [she] reasonably believes to be the use or imminent use of unlawful physical force by that other person, and [she] may use a degree of force which [she] reasonably believes to be necessary for that purpose.

¶ 27    A defendant is entitled to an instruction on self-defense if the defendant presents "some credible evidence" supporting that affirmative defense. *Pearson v. People*, 2022 CO 4, ¶ 23, 502 P.3d 1003, 1008. In this case, the court gave the jury a self-defense instruction. Thus, the issue before us is not whether Gray was entitled to argue self-defense based on the evidence introduced at trial; rather, we must decide whether, after considering the evidence, the jury could reasonably have found that the prosecution disproved beyond a reasonable doubt either of the two prongs of self-defense specified in section 18-1-704(1).

10

¶ 28    Therefore, the prosecution could have defeated Gray's affirmative defense of self-defense by proving beyond a reasonable doubt that Gray (1) did not reasonably believe that Canciamilla was using or would imminently use unlawful physical force *or* (2) did not use a degree of force which she reasonably believed to be necessary to defend herself.  *See* § 18-1-704(1).

### 4.    The Prosecution Introduced Sufficient Evidence to Disprove Gray's Self-Defense Affirmative Defense Beyond a Reasonable Doubt

¶ 29    We initially consider whether the prosecution's evidence was "sufficient to disprove beyond a reasonable doubt" that Gray reasonably believed Canciamilla was using or would imminently use unlawful physical force.  *Harrison,* ¶¶ 10-12, 24, 36-39, 41, 465 P.3d at 19-20, 22, 24-25 (holding that the prosecution presented sufficient evidence to disprove the defendant's affirmative defense that someone had in good faith reported defendant's drug overdose to "the 911 system" and, therefore, defendant was immune from liability for possession of a controlled substance and drug paraphernalia).  "The touchstone of self-defense is whether, from the standpoint of the defendant, [her] belief that danger was imminent is reasonable."  *People v. Rodriguez,* 888 P.2d 278, 286

11

(Colo. App. 1994). We disagree with Gray's implication that her statement to Officer Steingart that Canciamilla shoved her down the basement stairs by the throat, without more, establishes that the prosecution failed to meet its burden of proof on the first prong of section 18-1-704(1).

¶ 30    As noted above, no witnesses testified that they had seen or heard Canciamilla shove Gray down the basement stairs, much less shove her by the throat. Rather, the witnesses in the house at the time of the incident painted a picture of a one-sided altercation in which Gray struck the first blow, and Canciamilla passively took Gray's blows without fighting back. Canciamilla told the officers that, although he "screamed and yelled" at Gray, he did not "get physical" with her and did not defend himself. He said he made "the conscious decision not to hit her back."

¶ 31    Epperson testified that he heard Gray yelling at Canciamilla, did not "hear any items being knocked over or anything like that" — "just the yelling" — and saw Gray with "her hands around [Canciamilla's] throat." Kretzmeier testified that she (1) only heard one person — Gray — yelling; (2) saw Gray follow Canciamilla outside the house "screaming and yelling"; (3) observed Canciamilla

crying; (4) had to use physical force to keep Gray away from Canciamilla because Gray "would just not stop"; (5) did not see any injuries on Gray; and (6) observed fresh scratch marks and bruises on Canciamilla's neck and arms. Jones testified that she saw Gray strike Canciamilla and saw Gray's right hand on his throat. Jones further said that Canciamilla did not try to defend himself.

¶ 32    It was the jury's role to decide the credibility of the witnesses. "We do not reweigh the evidence or assess witnesses' credibility on appeal because the jury is the sole judge of witness credibility." *People v. Griffiths*, 251 P.3d 462, 465 (Colo. App. 2010). In light of the evidence presented at trial, the jury could have disbelieved Gray's statement to Officer Steingart that Canciamilla had pushed her down stairs by her throat. *Cf. People v. Kessler*, 2018 COA 60, ¶ 12, 436 P.3d 550, 554 (The "fact finder is not required to accept or reject a witness's testimony in its entirety; it may believe all, part, or none of a witness's testimony."). Therefore, the jury could have reasonably found that the prosecution proved beyond a reasonable doubt that Gray did not reasonably believe Canciamilla was using or would imminently use unlawful physical force.

13

¶ 33    Next, we consider whether the evidence was sufficient to support a finding beyond a reasonable doubt that Gray did not use a degree of force that she reasonably believed was necessary — the second prong of section 18-1-704(1).  As noted above, the evidence supported a finding that Canciamilla did not push Gray down the basement stairs and that, although Canciamilla yelled at Gray, he did not use physical force against her or indicate that he was about to use physical force.  Rather, the unrebutted evidence showed that Gray repeatedly struck Canciamilla; she choked him until he struggled to breathe, gasped for air, and gagged; and Canciamilla passively allowed Gray to hit him again and again.  Given these facts, the jury could have reasonably concluded that the prosecution proved beyond a reasonable doubt that Gray used an unreasonable amount of physical force against Canciamilla.

¶ 34    Accordingly, we hold that the evidence, when viewed as a whole and in the light most favorable to the prosecution, was substantial and sufficient to support a conclusion by a reasonable mind that Gray did not act in self-defense.

### B.    Cross-Examination of Canciamilla Regarding His Probationary Status at the Time He Spoke with Responding Officers

#### 1.    Additional Facts

¶ 35    Canciamilla told the police officers who responded to Jones's 911 call that:

- He had drunk seven or eight shots of whiskey that night.

- He had been hit and choked.

- The hitting and choking had made his throat hurt.

Canciamilla also admitted to the officers that he began yelling at Gray before she raised her voice at him.  But as we explain below, the jury did not hear what Canciamilla told the officers about the altercation.

¶ 36    At the time of the incident, Canciamilla was on probation for a misdemeanor conviction for driving under the influence.  Under the terms of his probation, he was not permitted to consume alcohol or violate any state or federal law.  He was no longer on probation when the trial began, however.

¶ 37    Before opening statements, defense counsel argued that, following *Margerum*, the court should permit her to cross-examine Canciamilla about his probationary status at the time he spoke

with the officers to demonstrate that he had a "bias[ed] motive for . . . making the police report and claiming essentially that it was an unprovoked attack." Defense counsel asserted that Gray had the right to argue to the jury that Canciamilla had "a pretty strong bias and motive for him to fabricate essentially being a victim" in his discussions with the officers to avoid revocation of his probationary status and that the jury could therefore conclude he was the initial aggressor, and Gray had acted in self-defense. The court disagreed, noting that because Canciamilla was no longer on probation, he was not in a vulnerable position at the time of trial.

## 2. Standard of Review

A defendant implicates the Confrontation Clauses in the United States and Colorado Constitutions, U.S. Const. amend VI; Colo. Const. art. II, § 16, by arguing that the trial court erroneously prohibited her counsel from cross-examining a witness regarding the witness's probationary status. *See Reynolds-Wynn*, ¶ 32, 551 P.3d at 1218. We review de novo a defendant's contention that the trial court violated her rights under the Confrontation Clauses. *Id.* at ¶ 31, 551 P.3d at 1218. If there is no infringement on "the defendant's rights secured by the Confrontation Clause" in the

16

United States Constitution, we review a trial court's limitation on a defendant's cross-examination for an abuse of discretion. *Merritt v. People*, 842 P.2d 162, 166 (Colo. 1992).

### 3. Under the Facts of the Case, Gray's Counsel Did Not Have the Right to Cross-Examine Canciamilla Regarding His Probationary Status at the Time of the Incident

¶ 39 Gray asks us to extend *Margerum*'s reasoning by "allowing cross-examination of a witness's probationary status at the time of the offense and relative to a witness's statements before trial to cooperate with police," even if the witness is no longer on probation at the time of trial. She quotes *Margerum*: "when a prosecution witness is on probation, the key question is whether there exists a 'might have been influenced nexus' between the witness's probationary status and [his] potentially biased motive for testifying" and "that this nexus *always* exists when a prosecution witness is on probation in the same sovereign." *Margerum*, ¶¶ 11-12, 454 P.3d at 239-40.

¶ 40 Criminal defendants have a constitutional right to confront the witnesses against them. *Id.* at ¶ 10, 454 P.3d at 239 (citing U.S. Const. amend VI; Colo. Const. art. II, § 16). "This right is primarily secured through cross-examination." *Id.* "[W]hen a witness testifies

17

against a party, the party has a right to impeach that witness's credibility."  *Id.* at ¶ 11, 454 P.3d at 239.

¶ 41      The cases that Gray cites in support of her argument that the trial court violated her Confrontation Clause rights all concerned witnesses who were involved with the criminal justice system when they testified against the defendant or who had previously obtained favorable treatment.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 679-80 (1986) (holding that the trial court violated the defendant's rights under the Confrontation Clause of the United States Constitution by not permitting defense counsel to cross-examine a witness about the dismissal of his criminal charge after he agreed to speak with the prosecutor about the defendant's alleged crime); *Davis v. Alaska*, 415 U.S. 308, 309-11, 320-21 (1974) (concluding that the trial court erred by barring defense counsel from cross-examining a witness regarding his probationary status at the time of his pretrial identification of the defendant and at the time of trial); *Margerum*, ¶ 12, 454 P.3d at 240; *Kinney*, 187 P.3d at 559-61 ("[T]he trial court should allow broad cross-examination regarding the witness's motive for testifying whenever the witness has a pending case and his or her 'testimony against the defendant *might*

*be influenced* by a promise of, or hope or expectation of, immunity or leniency with respect to the pending charges against him, as a consideration for testifying against the defendant.'" (quoting *King*, 498 P.2d at 1144-45)); *see also People v. Jones*, 971 P.2d 243, 244 (Colo. App. 1998) (rejecting the defendant's argument that evidence of the victim's probationary status was admissible to show that her cooperation with, and statements to, police following the underlying incident were motivated by her "vulnerable status as a probationer," because no evidence suggested the victim believed her probationary status was in jeopardy), *overruled on other grounds by People v. Segovia*, 196 P.3d 1126, 1132 (Colo. 2008).

¶ 42 In her appellate briefs, Gray does not direct us to any case holding that a trial court necessarily violates the defendant's Confrontation Clause rights by barring defense counsel from cross-examining a prosecution witness regarding the witness's probationary status at the time the witness reported the defendant's alleged criminal conduct to law enforcement officers, even though the witness is no longer on probation at the time of trial. Likewise, at oral argument, Gray's counsel could not cite a case holding that defendants have the right to cross-examine witnesses regarding

their probationary status when the witnesses are no longer on probation when trial begins. Nonetheless, Gray urges us to extend *Margerum*'s reasoning to such situations because a witness's probationary status at the time of the offense "may have acted as motivation for the witness to cooperate with the police, especially when the witness could hold a belief they otherwise could be punished in relation to their probation or suspected of a crime."

¶ 43 In *Margerum,* the court provided three reasons why "the defense must be permitted to question a prosecution's witness about [his] probationary status when the witness is on probation in the same sovereign as the prosecution." ¶ 12, 454 P.3d at 240.

¶ 44 First, the court explained that "a prosecution witness who is on probation in the same state court system in which [he] is testifying is in a vulnerable position." *Id.* "That witness's ability to remain on probation is potentially in jeopardy and the threat of probation revocation — whether real or merely perceived — creates an incentive for a witness to try to curry favor with the prosecution who can seek the revocation of that witness's probation." *Id.*

¶ 45 Similarly, "a prosecution witness who faces a pending charge in the same judicial district in which the prosecutor asks him to

20

testify is at least as vulnerable as a witness on probation."

*Reynolds-Wynn*, ¶ 34, 551 P.3d at 1218. "This is so because prosecutors have 'broad discretion in the performance of [their] duties,' including whether to consent to a deferred prosecution, whether and what type of plea deal to offer, the severity of the sentence to recommend, or even whether to dismiss the charge." *Id.* (alteration in original) (quoting *People v. Dist. Ct.*, 632 P.2d 1022, 1024 (Colo. 1981)); *see also Van Arsdall*, 475 U.S. at 679 ("By thus cutting off all questioning" about the dismissal of the charge against the witness, which "a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause.").

¶ 46    Second, the court observed that "the desire to potentially curry favor with a prosecutor who can affect a witness's probation creates at least a perception that the witness has a motive to provide favorable testimony for the prosecution." *Margerum*, ¶ 12, 454 P.3d at 240.

¶ 47    Third, the court reiterated the well-established principle that "the witness's credibility is always relevant, meaning parties should

21

be afforded wide latitude during cross-examination to discover any potential source of bias and, more importantly, to provide the jury with all relevant information needed to make a credibility determination." *Id.*

¶ 48 The common thread running through the three reasons underlying *Margerum* is the possibility that the jury could perceive that the witness had an interest in currying favor with the prosecution to attempt to obtain a benefit that the prosecution had the power to confer, such as dismissal of a criminal charge, *see Van Arsdall*, 475 U.S. at 679-80; immunity or leniency regarding pending charges, *see Reynolds-Wynn*, ¶ 34, 551 P.3d at 1218; *Kinney*, 187 P.3d at 560-61; or favorable treatment while on probation, *see Davis*, 415 U.S. at 320-21; *Margerum,* ¶ 13, 454 P.3d at 240; *Jones*, 971 P.2d at 244. Under these circumstances, the jury could question the witness's credibility if it believed the witness was motivated by a desire to please the prosecution. Significantly, the cases focus on how the witness's *trial testimony* — not any statements that the witness may have previously provided to law enforcement officers — "*might be influenced* by a promise for, or

22

hope or expectation of, immunity or leniency." *Reynolds-Wynn,* ¶ 36, 551 P.3d at 1218 (quoting *Kinney,* 187 P.3d at 560).

¶ 49    These reasons are premised on the assumption that the witness could have reasonably contemplated what benefits he could obtain in exchange for assisting the prosecution. But there is a weaker connection between a witness's consideration of this type of possible agreement with prosecutors and the witness's statements to law enforcement officers regarding a purported criminal act.

¶ 50    When police officers ask a witness on probation for information about a purported crime but the witness is no longer on probation at the time of trial, the witness may have no reasonable expectation that the prosecutors who possess the authority to seek the revocation of the witness's probationary status would give the witness preferential treatment as a reward for the witnesses' prior cooperation with the officers. At the time the witness spoke with the officers, the prosecutors likely knew nothing about the purported crime. This situation is many steps removed from a scenario in which the prosecution asks a witness on probation to testify at trial. Those steps include the police officer's decision to arrest the defendant, the prosecution's investigation into the

matter, its decision to bring charges against the defendant, and finally its selection of which witnesses to call at trial.

¶ 51     For these reasons, we decline to apply *Margerum*'s bright-line rule to witnesses who were on probation when they provided law enforcement officers with information regarding the offense for which the defendant was charged but who are no longer on probation at the time of trial.  Thus, we hold that a defendant has no automatic right to cross-examine such a witness regarding that witness's one-time probationary status.

¶ 52     Cases from other jurisdictions confirm this conclusion.  For example, in *State v. Rincker,* the Nebraska Supreme Court held that defense counsel has no right to cross-examine a witness regarding his probationary status before trial.  423 N.W.2d 434, 441 (Neb. 1988).  If the witness is no longer on probation at the time of trial, he is "no longer vulnerable to the State's reprisal" because "he had been punished, and the effects of his violation of probation had become final and could not be enhanced by State action."  *Id.*  For the same reasons, the Wyoming Supreme Court concluded that the defense could not question a witness about her former status as a probationer.  *Salaz v. State,* 561 P.2d 238, 241 (Wyo. 1977) ("[T]he

24

witness . . . was not on probation or parole. She was not subject to loss of freedom or other punishment due to the previous juvenile adjudication. She had no fear of revocation of probation or parole if she failed to cooperate with the police.").

¶ 53    Our rejection of a bright-line rule that a defendant *always* has the right to cross-examine a witness about the witness's earlier probationary status if the witness is no longer on probation by the time of trial does not mean a defendant can *never* ask about a witness's prior probation. For this reason, we consider whether Gray had such a right under the facts of this case.

¶ 54    Nothing in the record suggests that Canciamilla considered his probationary status when he spoke with the officers. Moreover, the record does not show how soon after the incident Canciamilla satisfied the terms of his probation. If Canciamilla had completed his probation shortly after the incident, the prosecutors would have had no power to reward or punish him when they first reviewed his witness statement. Even if Gray had a constitutional right to cross-examine Canciamilla regarding his probationary status, defense counsel did not show that, at some point following Canciamilla's statements to the officers, the prosecutors were

authorized to ask the court to revoke his probation. *See Margerum,* ¶ 12, 454 P.3d at 240 (noting that the "witness's ability to remain on probation is potentially in jeopardy and the threat of probation revocation — whether real or merely perceived — creates an incentive for a witness to try to curry favor with *the prosecution who can seek the revocation of that witness's probation*") (emphasis added).

¶ 55     Moreover, following the attorneys' colloquy with the court regarding *Margerum,* neither the prosecutor nor defense counsel asked Canciamilla — or any other witness — what Canciamilla told the investigating officers. Defense counsel's cross-examinations of Canciamilla and Nicholas Romito, the only one of the responding officers who testified during the prosecution's case, focused on the injuries Canciamilla reported to the officers.

¶ 56     Further, as the court noted, disclosing Canciamilla's former probationary status to the jury would have created a risk that the jury would improperly hold the misdemeanor conviction against him in weighing his credibility. *See Banek v. Thomas*, 697 P.2d 743, 745 (Colo. App. 1984) ("Generally, credibility may not be impeached by evidence of prior misdemeanor convictions."), *aff'd,*

26

733 P.2d 1171 (Colo. 1986). Gray does not contend that she had the right to cross-examine Canciamilla regarding his prior misdemeanor conviction to avoid misleading the jury. *See People v. Mejia,* 534 P.2d 779, 780 (Colo. 1975) (holding that the trial court properly allowed cross-examination of a witness regarding his earlier arrest for misdemeanor possession of marijuana after the witness testified on direct examination that, "except for drunkenness, he had never been arrested").

¶ 57 The court possessed "wide latitude, insofar as the Confrontation Clause is concerned, to place reasonable limits on cross-examination based on concerns about, for example, . . . prejudice, confusion of the issues, . . . or interrogation which is repetitive or only marginally relevant." *Merritt,* 842 P.2d at 166. The court placed such limits on the defense's cross-examination of Canciamilla, but it did not preclude defense counsel from asking him about inconsistencies between his statements to the police officers and his trial testimony or about his intoxication at the time of the incident. We cannot say that the court erred by barring Gray's attorney from bringing Canciamilla's misdemeanor

conviction to the jury's attention to avoid the risk that the jury would discount Canciamilla's testimony because of that conviction.

¶ 58 Accordingly, we hold that the trial court did not err by declining to allow defense counsel to cross-examine Canciamilla regarding his probationary status when he spoke to the officers about the incident.

### III. Disposition

¶ 59 The judgment is affirmed.

JUDGE JOHNSON and JUDGE MOULTRIE concur.